THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* CAREY GREEN, Appellant.

*Rape — what is insufficient corroboration of the complainant's testimony as to the commission of the offense.*

Under section 283 of the Penal Code, which provides, "No conviction can be had for abduction, compulsory marriage, rape or defilement, upon the testimony of the female abducted, compelled or defiled, unsupported by other evidence," the corroborating testimony must extend to every material fact which is essential to constitute the crime.

Thus upon a trial under an indictment for rape. the fact that the defendant had sexual intercourse with the complainant, forcibly and against her will, must have "other evidence" in its support than that of the complainant.

A disclosure or statement made by the complainant to her mother two days after the offense does not constitute such "other evidence."

*Semble*, however, that a disclosure made by the complainant as she hastens from the place where the crime was committed, with torn clothing and with a dirt-covered, dishevelled appearance, bearing unmistakable evidence of a struggle, would constitute such "other evidence."

APPEAL by the defendant, Carey Green, from a judgment of the County Court of Otsego county in favor of the defendant, bearing date the 31st day of December, 1903, and entered in the office of the clerk of the county of Otsego, upon the verdict of a jury convicting the defendant of the crime of rape in the first degree.

*Edson A. Hayward* and *Gibbs, Wilbur & Gibbs,* for the appellant.

*Merritt Bridges,* for the respondent.

CHASE, J.:

The defendant at the time of the alleged crime was about thirty-seven years old; a married man living with his wife on a farm several miles from another farm on which the complainant resided with her parents. The complainant at the time of the alleged crime was about twenty-four years old. She is a cousin of the defendant's wife. Complainant had taught school two terms, and the defendant's wife is a school teacher, and at the time of the alleged crime was employed as the teacher of a school about three miles from where she lived with the defendant, and she was accustomed to go from her home to and from her school each school day.

About a week before the 1st of October, 1902, complainant received a letter from defendant's wife inviting her to visit at the defendant's and attend a fair. Complainant accepted the invitation and on September thirtieth went to the defendant's, arriving there about five o'clock in the afternoon. Defendant was at his house alone, but his wife came from her school in about ten minutes thereafter. Complainant remained there all night, sleeping in their parlor bedroom. During the evening defendant's wife said that the weather was so bad that she had not told her scholars that she was going to the fair.

In the morning she said she was going to her school and she also said to complainant that she could go to the fair with him (her husband). Complainant says that she replied that she "had rather go to school," but defendant's wife said: "It would be a nice day and we might better go to the fair." Defendant's wife left for her school at eight o'clock in the morning. Defendant's house faces the west and it is about forty-five feet from the road.

The front door opens into the living and dining room which is in the northwest corner of the house. The parlor opens from the living and dining room and it is in the southwest corner of the house. The parlor bedroom is east of the parlor and opens from it. The kitchen is east of the living and dining room and opens from it. East of the kitchen are two rooms and a porch south of the two rooms and a doorway opens from the kitchen to the porch and at the time of the alleged crime there was a screen door therein which opened outward and it was hung with a spring to keep it closed. East of the two rooms and the porch is a wood room. At the north-

east corner of the wood room but not opening from it is a water closet opening to the south. From the closet to the door leading from the porch into the kitchen is sixty feet. About ninety feet east of the wood room is the defendant's barn. The first story of the barn faces the house but the basement of the barn faces the east and away from the house. There is a driveway from the road in front of the house along the south side of the house facing the kitchen porch. It was necessary in going along the east side of the wood room to the closet to walk on a board about eight inches wide and eight feet long to prevent stepping in wet muddy ground.

The complainant's story of what occurred after defendant's wife went to her school is as follows: " After the defendant's wife left I changed my dress; I don't know where defendant was when I changed my dress; after I changed my dress I started to wash the dishes and then I went to the closet; the defendant came there while I was there; he asked if there was room for him, I said, ' no, I will get out;' then he got hold of me, caught hold of my arms and around my waist; I had on a calico waist; after he catched hold of me I tried to get away and told him to let go of me; I don't remember that he said anything; I struggled to get away in the closet and he pulled me out of the closet; he took me in the house. * * * When he grabbed me around the waist and started with me from the closet I tried to pull away from him and told him to let go; I made a noise; I screamed. * * * He took me through the kitchen and through the parlor and into the parlor bedroom; he had hold of me; he had hold of my arms; he took me into the parlor bedroom; he took me through the kitchen and the parlor, and after we got into the parlor bedroom he threw me over backwards on the bed; I don't remember that he said anything to me then; I screamed and he told me to keep still, to shut up; he threw my clothes up and I tried to keep them down; I had my drawers on; my drawers were on me; I tried to hang on my drawers and keep my clothes down; then he got right over on to me; then I told him to get up and screamed and he told me to keep still. * * * I told him I would go home and have him arrested."

Complainant says that sexual intercourse was then accomplished

by the defendant, and that she resisted the defendant with all the strength she had. She further says that her drawers were closed drawers, fastened with a button at the back; that they were taken off of her by the defendant. She says after the defendant got off of her, "I got up as quick as I could from the bed; then I found my drawers on the chair and put them on; I don't remember when they came off; I did not take them off." She further says, "I was awfully frightened."

While complainant was putting on her drawers defendant sat on the bed. They then left the room.

Complainant further says: "Next I went out into the kitchen and he asked me if I was mad and I told him 'yes,' and I should think he would be ashamed of himself; I then went out in the kitchen and he followed me; he then went out towards the barn and I went back in the sitting room and combed my hair; then I went back in the kitchen and commenced to wash the dishes; I don't know where the defendant was unless he was at the barn. I saw him after that; he came to the door and asked me if I was going to wash the milk can; I told him 'no.' (On cross-examination she said: "I told him 'no' I was not going to wash them. I told him it was because I would get my dress wet.") Nothing further was said. When I next saw the defendant he came to the door and said he was going on the hill after the horses; he had a halter; he then went on the hill. Then I changed my dress. * * * I then started for the car; the car was going north when I reached the track."

Complainant says she took the car and went about a mile north, and stopped at a hotel and there saw the proprietor and his wife whom she had previously known, and waited for a south-bound car. She remained there fifteen or twenty minutes, and then took an open south-bound car that passed the defendant's house. When the car reached a point near the defendant's house the defendant got on the car and sat down three or four seats ahead of complainant. When the car arrived at Oneonta, a distance of several miles from defendant's, the complainant went to the ticket office and the defendant followed her and each had a rebate check cashed; then they walked on the streets and stood upon the streets of Oneonta and talked for a short time. Complainant, referring to the conversation and what

she subsequently did, says, " defendant asked me if I was not going back with him; I told him 'no;' he asked me if I was not coming up to-night and I told him 'no,' and he asked what Bertha would think and I told him I did not know; I would tell her when I saw her. I told him to go back and he kept on following; when I came to Maple street I told him I was going to my aunt's, and he offered to pay my fare back if I would go back; he said if I would go back we would go to the fair to-morrow; I told him 'no' I was not going back. He followed me to the corner of Maple street. I went to my aunt's, Mrs. Bradley's. * * * I stayed there that night; that day I went down street with my aunt; in the afternoon * * * I called at her daughter's, Mrs. McCrum, my cousin. I stayed there next day until afternoon. I went down street to get a chance home; I left for home about five o'clock. I rode with Mrs. Coe; she lives about a mile below our place, and from there with Mrs. Burdick."

The alleged crime took place on Wednesday morning. Complainant arrived at her home Thursday night; and on Friday morning she told her mother and father what she claimed had occurred. She produced on the trial a calico waist in which was a tear, and she says it was torn by the defendant when he had hold of her in the closet. She also produced drawers and a wrapper showing some stains which she says resulted from a discharge occurring after the crime was committed.

A physician was called Saturday afternoon who examined the complainant, and then the drawers and wrapper were first removed and for the first time they were seen by a person other than the complainant. The physician testified that her hymen had been ruptured. He says he thought she was commencing to menstruate when he made the examination, and that he did not find any irritation or discharge that he should not expect to find the day before or just preceding the menstrual period. He says he was unable to tell how long the hymen had been ruptured; that it might have been ruptured three days before or three years before, but he should say it was a recent rupture. He further says that he examined her person, thighs and legs, for marks or bruises, but did not find any, and that there was nothing to indicate recent sexual intercourse.

It was necessary for the prosecution to prove beyond a reasonable

doubt that the defendant violated the person of the complainant without her consent and against her will and resistance.

It is provided by section 278 of the Penal Code as follows : " A person who perpetrates an act of sexual intercourse with a female not his wife, against her will or without her consent, or  *  *  *

" 2. When her resistance is forcibly overcome, or

" 3. When her resistance is prevented by fear of immediate and great bodily harm, which she has reasonable cause to believe will be inflicted upon her,  *  *  *  is guilty of rape in the first degree."

It is further provided by section 283 of the Penal Code that : " No conviction can be had for abduction, compulsory marriage, rape or defilement, upon the testimony of the female abducted, compelled or defiled, unsupported by other evidence."

The corroboration must extend to every material fact essential to constitute the crime.  (*People* v. *Page*, 162 N. Y. 272.)

The essential fact to constitute the crime for which the defendant stands convicted is that he had sexual intercourse with complainant forcibly and against her will.

Such essential fact must have some " other evidence " than that of the complainant to support it.  A disclosure or statement by the complainant, which depends wholly upon her veracity, is not " other evidence " in support of her version of the affair within the meaning of the statute.  (*People* v. *Page, supra.*)

The apparent exceptions to this rule are where the complainant makes disclosure of the assault as she hastens from the place where it occurred with torn clothing and dirt-covered, dishevelled appearance, bearing unmistakable evidence of a struggle.

We do not think the People presented sufficient evidence in corroboration of the testimony of the complainant to satisfy the requirements of the statute.

The way in which the alleged assault took place repels the idea of its being seriously against the complainant's will.  At the time of the alleged assault there were three men in the basement of defendant's barn.  Defendant knew they were there.  It is difficult to understand why he should have forcibly attacked complainant at a place where there was immediate danger of any outcry being heard at the barn, and also where he was in plain sight of the public highway, and where he was compelled to back up and drag

complainant after him a distance of about sixty feet in the open before reaching a door of the house, and then through doors and three rooms into a fourth room, where, a few minutes before or a few minutes after, he could have accomplished his purpose when complainant was in one of the rooms which he could have purposely closed to avoid exposure, and where the very suddenness of his assault would have tended to overcome much of the struggle which the complainant claims that she made against him.

The lack of any evidence in the bedroom to indicate injury or resistance ; the removal of the complainant's drawers by the defendant without their being soiled or in the slightest manner injured ; the fact that they were found by her after the assault on a chair in the room or on the foot of the bed ; the conversations by complainant with defendant at his house after the assault, and at Oneonta ; her delay in making disclosure of the alleged crime, and the entire lack of any marks or bruises on her person, all tend to show that if the defendant had sexual intercourse with the complainant her resistance was not as genuine, persistent and forceful as it should have been.

All the evidence that the prosecution claims to have presented in corroboration of the complainant's evidence is that she was at the defendant's house in the morning when the defendant's wife went to her school ; that she was subsequently seen with the defendant in Oneonta ; that although some of those who saw her at Oneonta and at home says she appeared naturally, yet several that saw her said that she was melancholy and sad, the physician's evidence and the fact that complainant told her parents that she had been assaulted, and that a calico waist she wore had been torn in the struggle.

This evidence, so far as it is in corroboration of the complainant's evidence, is not sufficient to sustain a conviction of rape in the first degree.

All concurred.

Judgment reversed and new trial ordered.