THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* CHARLES E. HUGHES, Appellant.

Third Department, May 3, 1973.

334

*Frank R. Bell* for appellant.

*William P. Sullivan, District Attorney,* for respondent.

MAIN, J. This is an appeal from a judgment of the Tompkins County Court, rendered on March 6, 1972, upon a verdict convicting defendant of the crime of rape in the first degree.

The complainant, a runaway from her parents' home, arrived in Ithaca, New York, on August 6, 1971 accompanied by two companions whom she had met two days before in Cambridge, Mass. At about 10:00 P.M., the trio met the defendant, Charles Hughes, an acquaintance of the complainant's male companions. Upon learning that they had no lodging, the defendant gave them the key to his room at the Ithaca YMCA. The defendant then left and the trio proceeded to the defendant's room where one of her companions and the complainant undressed and engaged in sexual intercourse while the other lay on his sleeping bag a few feet away. All three were asleep when the defendant arrived about midnight and at that point the complainant lay nude and alone in the defendant's bed. Some conversation occurred between the men and their versions of its context vary. Finally, the defendant turned out the light, undressed and got into his bed with the complainant. The complainant and her companions testified that the defendant had an instrument, varyingly described as a knife, a razor and a box opener. The complainant testified that defendant threatened her with the instrument and then had intercourse with her. She further testified that she attempted to push the defendant away and that she pleaded with him to stop. At some point during the early morning hours,

the complainant and the defendant left the room to use the bathroom located down the hallway. During their absence, the complainant's companions took no action to help the complainant or to seek help. Soon after the defendant and the complainant returned to the room and to the bed, the complainant testified that she obtained possession of the instrument and threw it out of the open window. She testified that the defendant then pulled her hair and choked her and told her that he could kill her and then engaged in more intercourse.

Her two companions substantially corroborated the complainant's version, but it is significant to note that both wrote their statements for the police after having been told what the complainant's version was. Their stated reason for not intervening was that they were afraid someone would get hurt. The defendant's testimony concerning the event differs from that of the other witnesses in that he denied that he told them he wanted to have sexual relations with the complainant and he denied having any weapon in his possession and he also denied having had intercourse. The defendant testified that he had asked complainant if he could lie down with her and that she answered, "sure". He testified that he kissed her and that she kissed him and that he touched her body. The defendant stated that the trio left his room at around 4:00 A.M., whereas the complainant and companions testified that they left between six and seven.

After leaving, the trio ate breakfast at a downtown restaurant or diner, walked around the city and then proceeded to Route 13 on the edge of the city where they were stopped by a police officer who took them to the Ithaca police station. The two young men were permitted to leave, after routine checks. However, the complainant lied about her identity, but this was discovered after the police found a phone number in her purse and contacted her parents who reported that she had run away and asked that she be detained, pending their arrival to pick her up. The complainant, awaiting the arrival of her parents, fell asleep in the jail and when she awakened, she related her story to the matron attending her. The defendant was arrested and, after a preliminary examination, all charges were summarily dismissed. The defendant was later indicted and was found guilty, after a trial in December of 1971, of rape in the first degree. On March 6, 1972 the defendant was sentenced to an indeterminate term, the maximum of which was not to exceed three years.

The first issue to be determined is whether or not the jury's verdict was against the weight of the evidence. The degree of the complainant's resistance, her failure to avail herself of

opportunities for escape, the behavior of her companions and her tardiness in reporting the alleged acts, and the fact that the allegation of rape suited her own interest and purpose, are factors that suggest that the verdict may have been against the weight of the evidence.

On the question of the complainant's resistance, where the charge is rape in the first degree, rape is not committed unless the woman opposes the man to the utmost limit of her power. The resistance must be genuine and active *(People v. Carey,* 223 N. Y. 519; *People v. Warren,* 24 A D 2d 664). It is difficult to conclude that the complainant here waged a valiant struggle to uphold her honor. By her own testimony, the sum total of her resistive efforts was to call to one of her companions once for help and to push the defendant away and ask him to stop and to make one attempt to leave the bed. It is, of course, conceivable that, if the defendant did have a knife or similar weapon, the complainant could have been in fear of her life. However, after the weapon had been disposed of and while in the presence of her two male companions in a crowded YMCA dormitory, " genuine and active " resistance would seem to have called for screams and a loud and fervent prayer for assistance from her male friends. While the conduct of her male companions in the early stages of the episode was not such as to instill much hope or confidence in the complainant, it was reasonable to expect that, with open windows and male residents of the dormitory nearby, her screams might penetrate the ear of less timid souls. The behavior of the complainant's companions during this episode, in and of itself, raises some serious doubts. They excuse their lack of action and assistance on their fear that someone might be hurt. Even after the weapon had been disposed of by the complainant, they neither went to her aid nor left the room to secure help, if they felt inadequate to handle the situation by themselves.

The failure of the complainant and her companions to report the incident until late the following afternoon casts further doubt on the truthfulness of the complainant's story. The fact that a complainant, in a prosecution for rape, delays making disclosure thereof, may be considered as bearing upon the guilt or innocence of the accused. *(People v. Estell,* 106 App. Div. 516; *People v. Green,* 103 App. Div. 79.) Would it not be both reasonable and logical to expect that one who had endured the horror of an episode like that described by the complainant would, at the first opportunity, report the incident to the police? Instead, the complainant and her companions left the scene, had their

breakfast and walked through the city to Route 13, intending to hitchhike to a neighboring village. Even when apprehended by the police, the complainant made no reference to the incident. Hours later, and then only after learning that her father, whom she feared greatly, was coming to pick her up, does she report the alleged attack. This very tardy and startling revelation could well be, under all of the circumstances, invented so as to placate her father's wrath and gain his sympathy. This delay casts further doubt.

Admittedly, the weight to be accorded the evidence and the inferences to be drawn therefrom are for the jury to determine. However, CPL 470.15 makes provision for reversal of a jury verdict when that verdict is found to be against the weight of the evidence. Consideration of all of the evidence in this case leads us to the inescapable conclusion that the defendant's guilt was not established beyond a reasonable doubt and that the verdict was against the weight of the evidence. Complainant's minimal resistance, no meaningful attempt to escape or to seek assistance, the incredible behavior of her male companions, and the delay in reporting the attack amply fortify this conclusion.

Because of this conclusion, we decide no other issue.

The judgment should be reversed, on the law, and the indictment dismissed.

HERLIHY, P. J. (dissenting). While this is a sordid factual event, there is eyewitness testimony as to the existence of the knife and to the effect that the complaining witness did protest against sexual relationships with the defendant. The record contains ample evidence that the defendant had sexual intercourse with the complaining witness and the only question which might be considered doubtful would be whether or not her resistance was sufficient so that the sexual intercourse amounted to rape. As is conceded in the majority opinion, the fact that the defendant had a knife would be sufficient for the jury to infer that the complainant was prevented from any great resistance. There being ample evidence to establish that at the time of the initial connection the defendant had a knife, the conduct of the complainant in regard to resistance at such later time as the defendant no longer had the knife would merely be an element for the jury to consider in regard to whether there had been a rape. The primary issue for the jury in this case was the credibility of the complainant and the two eyewitnesses to the events, as well as that of the defendant. Whether or not the two eyewitnesses went to the aid of the complainant would have no bearing upon the sufficiency of the evidence for a conviction of rape, the con-

duct of the eyewitnesses at most being sufficient to raise questions as to their credibility. While the majority criticizes the complainant for not promptly relating the event to the police, the record clearly discloses that at the time of these occurrences she was a runaway from home and was, in fact, detained by the police because of her runaway status. In any event, the lack of a prompt disclosure or hue and outcry to the police would only appear to affect credibility.

The most favorable evidence for the defendant upon the question of consent would be the admission of the complainant that she had had sexual relationships with one of the eyewitnesses only a short period of time prior to the alleged rape. In regard to the propensity of a complainant to indulge in promiscuous intercourse it was noted in the case of *Woods* v. *People* (55 N. Y. 515, 517) that such evidence was " proper for the consideration of the jury upon the question whether she assented to the intercourse ". It seems apparent that whatever the moral character of the complainant might be in a rape case, proof or evidence as to such character would not mean that the female could not be raped within the meaning of the Penal Law.

While the majority indicates that the passive conduct of the eyewitnesses constitutes " incredible behavior ", it should be further noted that the jury could well have found the defendant's testimony to be incredible. The defendant testified that when he came into his room he realized that the complainant had no clothes on and thereafter he lay down on the bed with her and merely had a discussion with her, kissing her and touching her on various parts of her body. This would indeed appear to be a case where the conduct of the male eyewitnesses and defendant was something other than what would be expected; however, the record contains ample evidence from which the jury could have convicted the defendant of being guilty beyond a reasonable doubt.

The judgment should be affirmed.

GREENBLOTT and KANE, JJ., concur with MAIN, J.; HERLIHY, P. J., and COOKE, J., dissent and vote to affirm in a separate opinion by HERLIHY, P. J.

Judgment reversed, on the law, and indictment dismissed.